1

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

4    WAUSAU UNDERWRITERS INSURANCE, et al.,

5                      Plaintiffs,

6       -versus-                          05-CV-210

7                                         (MOTION)

8    CINCINNATI INSURANCE COMPANY,

9                      Defendant.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

11

12

13

14           TRANSCRIPT OF PROCEEDINGS held in and for the

15   United States District Court, Northern District of New York,

16   at the James T. Foley United States Courthouse, 445 Broadway,

17   Albany, New York 12207, on MONDAY, FEBRUARY 13, 2006, before

18   the HON. THOMAS J. McAVOY, Senior United States District

19   Court Judge.

20

21

22

23

24

25

1

2  APPEARANCES:

3  FOR THE PLAINTIFFS:

4  JAFFE & ASHER (by telephone)

5  BY:  MARSHALL POTASHNER, ESQ.

6

7

8  FOR THE DEFENDANT:

9  HISCOCK & BARCLAY

10  BY:  JOHN CASEY, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Court commenced at 11:07 AM.)

 2                    MR. POTASHNER:  Good morning, your Honor.

 3                    THE COURT:  Why don't you go ahead and call

 4     it.

 5                    THE CLERK:  Wausau Underwriters Insurance,

 6     et al., versus Cincinnati Insurance Company, 2005-CV-210.

 7                    May I have the appearance for the plaintiff,

 8     please?

 9                    MR. POTASHNER:  Yes.  This is Marshall

10     Potashner, of Jafee & Asher, for the plaintiffs.

11                    MR. CASEY:  John Casey of Hiscock & Barclay.

12                    THE COURT:  All right.  These are

13     cross-motions for summary judgment.  Who went first?

14                    MR. POTASHNER:  I did, your Honor.

15                    THE COURT:  Okay, Mr. Potashner, why don't

16     you tell us why the Court should grant summary judgment?

17                    MR. POTASHNER:  Your Honor, the whole issue

18     before the Court is whether Town Square is an additional

19     insured under an insurance policy issued by Masciarelli

20     Construction.  It is undisputed or otherwise hasn't been

21     argued in the motion papers.  It is undisputed and has not

22     been argued in the papers that if Town Square is an

23     additional insured, under the policy, that Cincinnati's

24     coverage is primary and Wausau's coverage is excess.  The

25     duty to defend arises where the allegations in the
```

1   underlying complaint suggest a reasonable possibility that

2   the covered claim has been alleged.  Contrary to

3   Cincinnati's arguments, the burden of proof and the burden

4   here is not here because Town Square is an additional

5   insured and not a named insured.  As the case law makes

6   clear, the burden is the same.

7            In addition, contrary to Cincinnati's

8   argument, we need not show the actual cause of the accident

9   to show a duty to defend.  Duty to defend is based on the

10  allegations in the complaint and may also arise from other

11  documents in the underlying action.  If there is an

12  ambiguity as to whether or not a duty to defend exists, then

13  a duty to defend does exist.

14           As the Second Circuit held in the Hugo Boss

15  Fashions versus Federal Insurance Company (phonetic) case,

16  there are three types of ambiguities that may give rise to a

17  duty to defend.  The first is factual, what is alleged in

18  the underlying action.  If the allegations are equivocal, as

19  to the facts alleged, and one possibility is that a covered

20  claim is alleged, then a duty to defend exists.

21           The second ambiguity is legal.  If the cases

22  are equivocal as to whether or not the insurance policy

23  provides coverage, then a duty to defend exists.

24           The third is contractual.  If the insurance

25  policy is ambiguous as to whether it applies, one

1    construction is that it does apply, then a duty to defend

2    exists.

3                Here, Therone Williams commenced the

4    underlying action against Town Square, Masciarelli

5    Construction and Visions Federal Credit Union.  He alleged

6    that he sustained injuries on February 27, 2003, as a result

7    of slipping and falling on ice in a parking lot owned by

8    Town Square.  It is undisputed that Cincinnati's policy

9    provides that Town Square is an additional insured under the

10   Cincinnati's policy, quote, with respect to liability

11   arising out of Masciarelli's ongoing operations performed

12   for Town Square by Masciarelli.  As such, if there is any

13   ambiguity in the allegations in the underlying action, the

14   meaning of the term "ongoing operations" or in the way a

15   New York court would apply it, then a duty to defend exists.

16               Here, the complaint and bill of particulars

17   in the underlying action makes it absolutely clear that the

18   claim arises from a slip and fall on ice on a parking lot

19   that Masciarelli Construction was contractually responsible

20   for plowing and salting.  For example, I will not go into

21   each allegation as they are set forth in our motion papers,

22   but in the bill of particulars, paragraph two, in the

23   underlying action, Williams specifically alleges that the

24   location of the accident is, quote, first row parking, far

25   left space along the side of the median.  On the same bill

1    of particulars, he alleges that the cause of the accident

2    was, quote, black ice on the parking lot.  And further -- he

3    further alleges that, quote, Williams slipped and fell due

4    to a layer of ice formed on a parking lot, end of quote.

5              Cincinnati's attempt to argue that Williams

6    might have slipped on the sidewalk is not only factually

7    unsupportable, it is legally irrelevant.  In fact, your

8    Honor, one of the pictures attached to Cincinnati's papers

9    establishes that, contrary to Cincinnati's argument, that

10   Williams' accident did not occur on the sidewalk.  If your

11   Honor will turn to Exhibit F of the Mitchell affidavit

12   submitted by Cincinnati, it's the last page after the

13   deposition, you will see two pictures.

14             THE COURT:  Go ahead.

15             MR. POTASHNER:  Okay.  In his deposition,

16   Mitchell -- I am sorry, in his deposition, Williams stated

17   that he was in the parking lot reaching for the front door

18   to open it when he fell.  Given that the sidewalk is in

19   front of the car, Williams must have been at least eight to

20   ten feet away from the sidewalk when he fell.  He did not

21   fall on the sidewalk or even just coming off of it.

22             Cincinnati's further argument that the

23   accident did not arise out of Masciarelli's ongoing

24   operations for Town Square is unsustainable.  Masciarelli's

25   conduct and responsibility under the contract were not over

1    and there is more than a reasonable possibility that the

2    claim in the underlying action arose because either

3    Masciarelli did not salt or plow or did not salt or plow

4    properly or failed to salt or plow as it should have.

5                Cincinnati's argument is that the term

6    ongoing operations is limited to claims arising from

7    accidents occurring while Masciarelli is at the job site,

8    the parking lot, ignores New York precedents and the

9    language of its own policy.  Your Honor, phrase is "ongoing

10   operations," plural, and not ongoing operation.  This

11   implied a series of multiple applications -- sorry, a series

12   of multiple operations during the course of which Town

13   Square would be covered.

14               In a case directly on point, Perez versus

15   New York City Housing, the New York Appellate Division held

16   that this term does not require -- the term "ongoing

17   operations" does not require the named insured to be on site

18   at the time of the accident, as long as a claim arises from

19   the named insured's operations.

20               Your Honor, this Appellate Division case is

21   binding -- this case is binding on this Court unless

22   Cincinnati was able to offer, quote, persuasive evidence

23   that the New York Court of Appeals would hold differently.

24   Cincinnati has not attempted to offer any evidence that the

25   New York Court of Appeals did not follow the holding in the

1    Perez case.

2              Furthermore, the phrase at the end of the

3    endorsement, Cincinnati's endorsement, that a person or

4    organization's status as an insured under this endorsement

5    ends when your operations for that endorsement are completed

6    construes the enforcement is broader than Masciarelli

7    actually working on site.  If the phrase ongoing operations

8    was as limited as Cincinnati argues, this last sentence

9    would be superfluous.  The policy should not be construed to

10   render this policy meaningless.

11             Finally, Cincinnati, in its motion papers,

12   raises the sole negligence exclusion, exclusion not

13   previously raised in its disclaimer of coverage.  This is an

14   exclusion that Cincinnati bore the burden of proof on this

15   exclusion.  Cincinnati points to and submits not one iota of

16   evidence that the exclusion applies.

17             With respect to the duty to indemnify, the

18   plaintiffs are entitled to indemnification or settlement

19   because there was a potential for liability for covered loss

20   based upon the actual facts known at the time of the

21   accident.  This is shown by the pleadings, the bill of

22   particulars and Williams' own deposition testimony in the

23   underlying action.

24             Because Cincinnati breached a duty to defend,

25   once that simple showing was made by plaintiffs, the burden

1    shifted to Cincinnati to show that some or all of the

2    settlement was paid on the claim or the settlement sum was

3    unreasonable.  Again, Cincinnati simply submits no evidence

4    to support its burden.  Because Cincinnati failed to make

5    the necessary showing, it must be bound by the natural

6    inference of the settlement that Williams was entitled to

7    recovery from Town Square based upon the allegations in the

8    verified complaint and the underlying action.

9            Finally, Cincinnati raises an argument

10   concerning the reasonableness of the settlement.  Again,

11   Cincinnati has not submitted an iota of evidence that the

12   settlement was unreasonable.  It failed to satisfy its

13   burden of proof to establish a triable issue of fact and it

14   is not entitled to a trial, your Honor, simply by arguing

15   reasonableness, which is all it has done.  It has argued,

16   but not submitted any evidence.

17           Accordingly, your Honor, for these reasons

18   and those reasons in my papers, we respectfully submit that

19   this Court should grant summary judgment in favor of the

20   plaintiffs, should hold that Cincinnati had a duty to defend

21   and indemnify Town Square for the underlying action and hold

22   that the case has been settled, hold that Cincinnati is

23   responsible for reimbursing Wausau the $99,000 settlement

24   sum, plus the defense costs, for the total amount of

25   $108,196.70.

1                    Thank you, your Honor.

2                    THE COURT:  Thank you, Mr. Potashner.  Okay,

3      Mr. Casey.

4                    MR. CASEY:  May it please the Court:  This is

5      really a dispute between two insurance companies to

6      determine which carrier afforded coverage for this loss to

7      Town Square, if any, and whether or not Wausau should be

8      reimbursed for the settlement that they voluntarily entered

9      into with the underlying plaintiffs and defense costs.

10                    I think the issues are, number one, is there

11      coverage under the Cincinnati policy?  The burden is on the

12      alleged insured or additional insured -- here, Town

13      Square -- to prove that there is coverage in the first

14      instance.

15                    The next issue is this question of ongoing

16      operations relating to Masciarelli, the plowing contractor,

17      and the issue of sole negligence.  The policy does not cover

18      liability arising out of the sole negligence of Town Square.

19                    Finally, we have the issue of co-insurance,

20      which carrier is primary or excess or are they equal.  Town

21      Square alleges that it's an additional insured under the

22      automatic additional insured endorsement of the policy which

23      was issued by Cincinnati to Masciarelli.  Town Square is not

24      a named insured or a named additional insured.  There is a

25      provision in the policy that if there is a contract out

1   there that requires you, Masciarelli, to name someone as an

2   additional insured, they're covered, but only with respect

3   to your ongoing operations.

4              Now the question is what does "ongoing

5   operations" mean?  And I think we have to look at the

6   contracts that are before the Court, the maintenance

7   agreements, and there's three I will discuss.  There is the

8   plowing and -- plowing maintenance agreement, the

9   sand/salting maintenance agreement and then there is a

10  separate maintenance agreement that we've presented to the

11  Court involving another contractor who was also responsible

12  for plowing and salting at this mall.

13             The initial contract with Masciarelli and

14  Town Square, dated November of 2002, provides for plowing,

15  and it specifically sets forth the scope of the work on

16  page 3.  "The contractor will perform snow plowing of all

17  parking lots, roads, service roads, loading areas within the

18  Town Square mall, including the out parcels, which are

19  indicated on the attached site plan."  Now, the site plan,

20  as far as the contract documents that I've seen, is not

21  attached, so we really don't know exactly what the site plan

22  includes or doesn't include, but at least there is a

23  description here.

24             If you turn to page 5, here is where we get

25  to what the ongoing operations involve.  "Need for snow

1    plowing.  Snow plowing will be required when we receive two

2    inches of snow or greater.  The contractor will be on call

3    24 hours a day, 7 days a week and will be reasonably

4    available when the owner requires plowing to be done.  The

5    contractor will be authorized to plow if a general snow is

6    occurring and we have accumulated two inches of snow and

7    more is forecast."

8              This doesn't make Masciarelli an insurer of

9    that parking lot.  He is not on the premises.  If there's

10   two inches of snow or greater, he has to plow and he has to

11   be on call.  There is no proof before the Court that would

12   indicate that he didn't perform these requirements.  There

13   is a letter from Cincinnati Insurance Company which

14   indicates that the last time he was there was two days

15   before, on the 25th -- this accident took place on the 27th

16   of January -- that there was no intervening weather trigger

17   that would call for him to be there.  There was no -- at

18   least as far as plowing.

19             Let's turn to the salting contract, and

20   that's attached to plaintiffs' moving papers, Exhibit 5.

21   Again, it's described as a maintenance agreement and it

22   describes "scope of work, salting," this is on page 3.  "The

23   contractor will salt all parking lots, roads, service roads

24   and asphalt loading areas.  The contractor at all times will

25   use his best efforts to cover all areas with salt so people

1    do not get stuck or slip on ice."

2              Turning to page 5, "Need for salting.

3    Salting operations will be required if we receive less than

4    two inches of snow.  Salting operations will be required if

5    we receive freezing rain and/or sleet or standing water

6    freezing.  The contractor will be on call 24 hours a day,

7    7 days a week, and will be reasonably available when the

8    owner requires salting to be done."  Again, another

9    description of what the ongoing operations are.

10              This is not a situation where the contractor

11   has agreed to be responsible for any type of accident that

12   might occur, any type of condition.  In this situation, the

13   only proof we have is he was there two days before, took

14   care of whatever was necessary, was not called back, was not

15   requested to do anything, that there was no indication of

16   any weather trigger, snow, two inches or more, or less than

17   two inches, freezing rain or any request to do anything.

18              I submit that the question of what ongoing

19   operations are is probably a question of fact here as to

20   what happened.  We need a trial of that issue to determine

21   whether there were ongoing operations that would trigger the

22   coverage for the additional insured.

23              As far as the sole negligence question, I

24   think that's tied into this.  Could the owner here, the

25   mall, be found solely negligent because they didn't notify

1    this contractor that we need plowing, we need salting, we

2    need sanding?  The testimony from Mr. Williams was he did

3    park in the area of the parking lot described by counsel,

4    got out of his car, had no trouble walking into the Visions'

5    store.  When he returned, there was some snow that he

6    described it as bulging, but it was kind of coming off of an

7    island, okay, out onto the lot.  We don't know how that got

8    there.  Did it get there from plowing?  Did it blow?  Was

9    there some type of wind event that occurred and caused it?

10   There is just no indication of how that occurred.

11              So, I think the question of the sole

12   negligence issue is another question of fact that really

13   can't be resolved on these papers.  And despite the fact

14   there was an underlying case and there was some depositions,

15   it doesn't appear that either of these issues were

16   addressed.

17              As far as, you know, who's responsible,

18   again, we've attached a copy of another contract between the

19   plaintiff Town Square and an outfit called Greenskeeper.

20   And it's the same identical type contract as Town Square had

21   with us, or with Masciarelli; it provides for salting and

22   plowing.  On page 3, it talks about scope of work, salting,

23   parking, asphalt areas, and it indicates that "Northeast

24   United Corporation will salt all parking lots, roads,

25   service roads and asphalt loading areas."  I'm not sure who

1    Northeast United Corporation is, but it's another entity

2    that apparently, at least as of November of 2002, was doing

3    salting operations.

4                It also describes the scope of the work for

5    sidewalks for Greenskeeper and basically describes that

6    they're gonna plow, they're gonna salt.  Again, the only

7    reason I mention it, I think it raises an issue if another

8    contractor is there moving snow off the sidewalks, which is

9    where this parking space was, next to the sidewalk.  If

10   somebody is moving snow off there, did they put the snow on

11   the median or in the area where Mr. Williams fell?  They

12   have the same responsibilities under their contract as

13   Masciarelli.  And again --

14               THE COURT:  I'm a little confused about that

15   argument because as I understood what he slipped on was

16   black ice.  Black ice is something that is difficult to see

17   when it's on asphalt.  I understand the composition of the

18   parking area was asphalt.  If snow had been plowed over the

19   black ice, perhaps it would have been safer than it was at

20   the time he fell.

21               MR. CASEY:  I think there may have been an

22   issue, reading his deposition testimony, the bill of

23   particulars and the complaint talked about black ice, when

24   he got to -- when Mr. Williams testified, well, maybe it was

25   brown, it was dirty, you know, so it was a typical slip and

 1    fall case.  But just referring to this contract for a
 2    minute, under "out parcels," on page 5, this is the
 3    Greenskeeper contract, it says "the owner and contractor
 4    mutually understand and agree that the areas labeled, quote,
 5    Pizzeria Uno, Taco Bell, Barnes and Noble's bookstore and
 6    Visions Federal Credit Union" -- this is where he was
 7    going -- "on the attached site plan are part of this
 8    contract," part of the Greenskeeper contract.  "No
 9    additional funds will be allocated for the plowing and
10    salting of these areas."  Again, there is a question of
11    whether this contractor may have done some plowing or
12    salting in that Visions area.
13              THE COURT:  The contractor was never pled in
14    on the original action, was he?
15              MR. CASEY:  No.  But we didn't have any
16    control over who the plaintiff sued.  The plaintiff sued
17    Masciarelli.  Masciarelli, apparently, had very little to do
18    with this action.  There was no settlement, nothing paid by
19    Masciarelli, all paid by Town Square through their insurance
20    carrier.  From all we can tell, the plaintiff didn't
21    seriously pursue liability against Masciarelli.  The case
22    was just settled.  They had EBTs of the plaintiff, I don't
23    see any EBTs of the defendants in that case, and it settled.
24              Now, finally, if I look at Exhibit E attached
25    to the Anthony Piazza affidavit, there is a certificate of

THERESA J. CASAL, RPR, CRR
UNITED STATES COURT REPORTER - NDNY

1    liability insurance from National Grange Insurance to

2    Greenskeeper Landscaping, same amounts as our policies,

3    2 million aggregate, 1 million each occurrence, which

4    provides liability coverage for Greenskeeper and adds Town

5    Square as an additional insured.  Again, the same type of

6    requirement as was in the Masciarelli policies, Town Square

7    had to be added as an additional insured.

8                     And I mention that because I think that

9    raises another question regarding the coverage.  If you get

10   to the question of, well, which of these two carriers is

11   primary and which is excess, the automatic additional

12   insured endorsement attached to plaintiffs' moving papers

13   specifically provides that the Cincinnati insurance coverage

14   is excess over any other insurance available to the

15   additional insured, i.e., Town Square as an additional

16   ensured by attachment of an endorsement to another insurance

17   policy, whether that insurance policy is excess or any other

18   basis.  That's why I brought the Court's attention to the

19   National Grange policy, because that would trigger this

20   provision.  If Town Square is an additional insured under

21   that policy and if that policy applies, then we are excess.

22                     THE COURT:  But that's not before the Court.

23   If that were before the Court, I could certainly decide that

24   issue, as well as the issue that's been presented to the

25   Court -- that is, the issue between the Town Square

```
 1    insurance carrier and Masciarelli's carrier, which is
 2    squarely before the Court by virtue of these motions.  But
 3    there's nothing before the Court regarding Greenskeeper or
 4    National Grange, so I certainly can't adjudicate that.
 5              MR. CASEY:  Well, I don't know that -- I
 6    mean, I think that at least there's a question of fact that
 7    if there is a policy, and this -- the affidavit and the
 8    documents we've submitted certainly suggest that there is,
 9    and you know, if there isn't, there isn't, but it appears
10    there is a policy there that supplies additional coverage to
11    them.  And we have raised necessary party as an affirmative
12    defense.  Then this carrier and Greenskeeper are necessary
13    parties to this action, which they didn't join.  I mean,
14    they know who their carriers are and who's covered.
15              THE COURT:  Nobody moved the Court to compel
16    joinder.  I haven't seen any motion papers like that.
17              MR. POTASHNER:  Your Honor, may I address
18    this one issue?  The New York case law is very clear.  If
19    there is another insurance out there, that's not a defense
20    to this insurance carrier not to pay its obligation.  It can
21    then pay and go after the other carrier.
22              THE COURT:  That's where I was coming to.  I
23    haven't gotten that far yet.  If that's the way it works
24    out, that's possibly a viable avenue.  And even more so, it
25    intrigues the Court because the Court is thoroughly familiar
```

1     with Town Square Mall parking lot.  Although I hate to admit
2     it, I do go down there on occasion; it does have Dick's
3     Sporting Goods, as well as Sam's Club.  I am familiar with
4     the layout and where the out buildings are.  It sounds to me
5     like the Greenskeeper scope of coverage, the area where
6     they're actually supposed to do the salting and plowing, is
7     in relation to the out buildings, which are directly south
8     of the main parking lot of the mall, which houses a large
9     number of businesses in connected buildings.  Then these
10    other buildings, such as the restaurant, Visions Credit, the
11    Barnes & Noble, they're all separate and distinct at the
12    south end of the parking lot, and it sounds like that
13    coverage might somehow be more applicable there.  I'm not
14    gonna get into that because it's not before me.  But it's
15    intriguing to me.  So, if you gentlemen are -- maybe we can
16    get back to Mr. Casey and what he was arguing, but I
17    appreciate what you were talkin' about.
18              MR. CASEY:  Well, I was just pointing out
19    apparently there was another policy that would make us
20    excess over their policy and I only just say before the
21    Court, it's in the motion papers.
22              THE COURT:  It's not in the pleadings.
23    Nobody pled those people.  I mean, it's not the Court's
24    fault.  Maybe not your fault.
25              MR. CASEY:  Okay.

```
 1                    THE COURT:  All right.

 2                    MR. CASEY:  As far as the sole negligence

 3    issue, I would point out that a case cited by the

 4    plaintiffs, another Wausau case, which I think Mr. Potashner

 5    was involved in, in that case, I don't recall who the judge

 6    was, I think it's in the Southern District, but he

 7    specifically held that the sole negligence issue was a

 8    question of fact.

 9                    THE COURT:  Yeah, but you have the burden of

10    proof on the sole negligence issue, right?

11                    MR. CASEY:  Well, I think we raised a

12    question of fact here.

13                    THE COURT:  Okay.

14                    MR. POTASHNER:  Your Honor, may I just

15    respond to a few statements?

16                    THE COURT:  Briefly.

17                    MR. POTASHNER:  It will be very briefly.  On

18    the Greenskeeper, Mr. Casey was not the handling attorney,

19    but if you look at the undisputed facts submitted by

20    Cincinnati, as they admit in paragraphs 12, 13 and 14,

21    Greenskeeper was responsible for the sidewalks, Masciarelli

22    was responsible for the parking lot.

23                    THE COURT:  Okay.

24                    MR. POTASHNER:  That is the distinguishing

25    issue.
```

1          THE COURT:  Mr. Casey was careful when he

2   read to me Greenskeeper's obligation.  He was careful to

3   talk about sidewalks and not parking lots.  It's just

4   interesting.  Go ahead.

5          MR. POTASHNER:  Okay.  Second, if you look at

6   the -- Masciarelli also testified, by the way, that he was

7   responsible, actually deposed him at -- he was responsible

8   for plowing all the parking lots and, in fact, salting all

9   the parking lots.  And I just point out the scope of work

10  under the salting contract.  "The contractor, at all times,

11  will use his best efforts to cover all areas with salt so

12  people do not get stuck or slip on ice."  That's exactly

13  what happened here.  We don't know exactly how it happened.

14  It's that uncertainty that creates a duty to defend.

15  Cincinnati had the opportunity to come in, control the case,

16  make a decision regarding settlement that it chose to make,

17  and, instead, it just simply denied coverage and refused to

18  step in and do its duty.

19          THE COURT:  Okay.  The Court is prepared to

20  make a decision.

21          Plaintiffs commenced the instant action

22  seeking a declaration that defendant had and has a duty to

23  defend Town Square Mall in a personal injury action pending

24  in state court; declaring that defendant had and has a duty

25  to indemnify Town Square Mall in the underlying litigation;

1    declaring that the defendant's coverage is primary to that

2    of plaintiff Wausau; and awarding damages for attorneys'

3    fees and other amounts incurred in Town Square Mall's

4    settlement of the underlying personal injury action.

5    Presently before the Court are plaintiffs' motion for

6    summary judgment and defendant's cross-motion for summary

7    judgment.

8            Wausau issued an insurance policy for Town

9    Square Mall.  Cincinnati issued an insurance policy to

10   Masciarelli Construction, which was retained under two

11   contracts to provide salting and plowing services in the

12   Town Square Mall parking lots.  The Cincinnati policy

13   included as an additional insured any person or organization

14   for whom Masciarelli was required to add as an additional

15   insured under a written contract or agreement, but only with

16   respect to liability arising out of Masciarelli's ongoing

17   operations performed for that additional insured.

18           It is clear in this case that Masciarelli had

19   a written contract whereby it was required to add Town

20   Square Mall as an additional insured.  Thus, the Court

21   finds, and Cincinnati appears to concede, that Town Square

22   Mall is an additional insured, provided the liability arose

23   out of Masciarelli's ongoing operations for Town Square

24   Mall.

25           Cincinnati argues that Town Square Mall is

1   not an additional insured because no liability arose out of

2   Masciarelli's ongoing operations performed for Town Square

3   Mall.  Cincinnati contends, because Masciarelli was not

4   actually plowing or sanding or salting the parking lots at

5   the time Mr. Williams slipped and fell, that there was no

6   ongoing operations and, therefore, the additional insured

7   provision is inapplicable here.  Plaintiffs, on the other

8   hand, contend that there were ongoing operations because the

9   snow plowing and salting contracts were in full force and

10  effect as of the date of Mr. Williams' accident and the

11  contracts had not been fully completed because Masciarelli

12  continued to be responsible for plowing and sanding the

13  parking lots for that snow season.

14            Cincinnati's definition of "ongoing

15  operations" is too narrow.  Clearly, the concept of ongoing

16  operations contemplates more situations than where the named

17  insured is actually on site.  Thus, for example, it is this

18  Court's opinion that the additional insured provision

19  clearly would be applicable where there was an ongoing

20  construction project, but the injury occurred during

21  non-work hours or during a pause in the construction.  In

22  this situation, there would be ongoing operations even

23  though the named insured was not actually on site at the

24  time of the incident.  See Perez versus New York City

25  Housing Authority, 302 A.D. 2d 222; Paolangeli versus

1    Cornell University, 187 Misc. 2d 559, 723 NYS 2d 835.  In

2    Perez, the Housing Authority retained a contractor for the

3    testing and replacement of radiator valves and traps in the

4    building where plaintiff was injured.  The contractor

5    replaced the radiator valves in the apartment in June 1996.

6    The plaintiff was injured in November 1996.  In December

7    1996, the contractor, pursuant to the contract, completed

8    tests designed to assure that the new valves and traps were

9    properly installed.  The Appellate Division found that the,

10   quote, ongoing operations, closed quote, provision was

11   applicable.  The Court stated that, quote, under any plain

12   meaning of the word, the contractor's work was ongoing as

13   long as the tests designed to assure proper performance

14   remained undone, closed quote.

15           The plowing and sanding contracts, however,

16   do not squarely fit within the construction example.  Perez

17   involved a specific task -- testing and replacement of

18   radiator valves and traps in a building.  Until that testing

19   and replacement was completed, the operations were ongoing.

20   Here, however, we are faced with a contract that

21   contemplates discrete operations; that is, salting and

22   sanding only when the need arises.  Without doubt, there was

23   an ongoing contract to plowing and sanding at the time of

24   the injury to Mr. Williams.  However, the existence of a

25   contract to perform services does not compel the conclusion

1   that such plowing and/or sanding operations were ongoing at

2   the time of the injury.  In this sense, the Court believes

3   that plaintiffs' definition is too broad.  Take, for

4   example, an attorney who was retained to be available to a

5   client for a specific period of time to handle any legal

6   issues that may arise during that period of time.  Is the

7   attorney actually engaged in ongoing representation of the

8   client, or is the attorney simply contractually available

9   when the need arises?

10              Nevertheless, considering the undisputed

11   facts in the record, the Court finds that the underlying

12   injury arose out of Masciarelli's ongoing operations for

13   Town Square Mall.  It is undisputed that Mr. Williams claims

14   to have fallen on ice in the parking lot.  Further

15   undisputed that Masciarelli was obligated to clear the snow

16   from and salt the parking lots.  Under the terms of the

17   salting agreement, Masciarelli was obligated, quote, at all

18   times to use his best efforts to cover all areas with salt

19   so people do not get stuck or slip on ice, closed quote.

20   See Sanding Contract and the arguments here today.  Because

21   this was an ongoing obligation and it was alleged that there

22   was ice on the parking lot on which Mr. Williams fell, the

23   liability arose out of Masciarelli's ongoing operations.

24              In this regard, this case is similarly

25   similar to the Minnesota case of K-Mart, Incorporated versus

1    Clean Sweep, Incorporated, 1997 Westlaw 666088, wherein the

2    Court found the ongoing operations clause to apply where a

3    person slipped and fell on snow in the parking lot hours

4    after the contractor finished plowing and the property owner

5    had inspected the parking lot.  See also Dayton Beach Park

6    No. 1 Corporation versus National Union Fire Insurance

7    Company, 175 A.D. 2d 854.  Similarly, Koala Miami Realty

8    Holding Company, Incorporated versus Valiant Insurance

9    Company, 913 So.2d 25, involved a situation where a company

10   contracted to perform janitorial services to a property

11   owner.  An individual slipped and fell in the restroom and

12   sued the janitorial company and the property owner.  The

13   Court found the property owner to be an additional insured

14   because the liability arose out of the ongoing operations of

15   the janitorial service.  Compare KBL Cable Services of the

16   Southwest, Incorporated versus Liberty, 2004 Westlaw

17   2660709.

18              The Court, therefore, finds that at the time

19   the incident occurred, Masciarelli was involved in ongoing

20   operations for Town Square and Town Square's liability for

21   Mr. Williams' injuries arose out of Masciarelli's actions to

22   or failures in connection with such ongoing operations.  For

23   these reasons the Court finds that Town Square Mall is an

24   insured under the policy.  We are, thus, presented with a

25   question of whether Cincinnati owed Town Square a duty to

1    defend.

2              The duty to defend is exceedingly broad.

3    IBM Corporation versus Liberty Mutual Fire Insurance

4    Company, 303 Fed 3d 419, at 424.  See also Servidone

5    Construction Corporation versus Security Insurance Company,

6    64 NY 2d 419, at 423 and 424.  Determining whether there is

7    a duty to defend requires examination of the policy language

8    and the allegations in the underlying complaint to see if it

9    alleges any facts or grounds that bring the underlying

10   action within the policy.  IBM Corporation at 424.  An

11   insurer must defend whenever the four corners of the

12   complaint suggest or the insurer has actual knowledge of

13   facts establishing a reasonable possibility of coverage.

14   IBM Corporation 424.

15             The complaint in the underlying litigation

16   alleges that at the time of Mr. Williams' fall, Masciarelli

17   was responsible for maintaining the parking lot at the Town

18   Square Mall, that Mr. Williams, quote, slipped and fell due

19   to black ice in the parking lot, closed quote, and that the,

20   quote, parking lot was in a dangerous condition, closed

21   quote, that Masciarelli and Town Square Mall had a duty to

22   keep the parking lot in a reasonably safe condition, that

23   Masciarelli and Town Square failed to maintain the parking

24   lot in a reasonably safe condition, that black ice in the

25   parking lot was an unsafe condition and that, as a result of

 1    the fall, Mr. Williams sustained injury for which

 2    Masciarelli and Town Square Mall are responsible.  These

 3    facts give rise to a reasonable possibility of coverage and,

 4    therefore, a duty to defend.  These facts suggest that an

 5    insured, Town Square Mall, is liable arising out of

 6    Masciarelli's ongoing operations performed for Town Square

 7    Mall.  Cincinnati, therefore, owed Town Square Mall a duty

 8    to defend.

 9                  The next question is whether Cincinnati is

10    required to indemnify for the settlement in the underlying

11    litigation.  An insurer's breach of a duty to defend does

12    not create coverage and, even in cases of negotiated

13    settlements, there can be no duty to indemnify unless there

14    is first a covered loss.  Servidone, 64 NY 2d at 423.  Thus,

15    a determination must be made whether there is a covered

16    loss.

17                  Based on the undisputed record, the Court

18    concludes that there is.  The undisputed record evidence is

19    that Williams fell on black ice in the parking lot owned by

20    Town Square Mall which was supposed to be plowed and sanded

21    or salted by Masciarelli.  This falls squarely within the

22    Cincinnati policy.

23                  Relying on certain policy language,

24    Cincinnati argues that plaintiffs have failed to prove that

25    the incident was not the result of Town Square Mall's sole

1  negligence.  The policy reads at follows:  Quote, the

2  insurance provided to the additional insured does not apply

3  to bodily injury arising out of the, B, sole negligence or

4  willful misconduct of the additional insured or its

5  employees, closed quote.  Assuming the burden is on

6  plaintiffs, there is insufficient evidence in the record

7  upon which a fair-minded trier of fact could reasonably

8  conclude that the incident arose out of Town Square Mall's

9  sole negligence.  The undisputed record evidence is that, by

10  contract, Masciarelli was obligated to Town Square Mall to

11  sand, salt and plow the parking lot.  There is no allegation

12  or evidence tending to suggest that Town Square Mall's

13  decision to retain Masciarelli was the sole contributing

14  factor resulting in Williams' injury.

15            In any event, plaintiffs do not have the

16  burden to prove that the incident was not the result of Town

17  Square Mall's sole negligence.  The policy language relied

18  on by Cincinnati is that of a policy exclusion.  See, for

19  example, Gap, Incorporated versus Fireman's Fund Insurance

20  Company, 11 A.D.3d 108, at 110; Hotel des Artistes,

21  Incorporated versus General Accident Insurance Company of

22  America, 9 A.D.3d 181, at 184.  Under each set of

23  circumstances, the burden is on the insurer to establish

24  the applicability of the policy exclusion.  Throgs Neck

25  Bagels, Incorporated versus General Accident Insurance

1  Company of New York, 241 A.D.2d 66, at page 70.  Cincinnati

2  has not pointed to any evidence tending to suggest that

3  Mr. Williams' injuries were the result of Town Square Mall's

4  sole negligence.  Accordingly, the Court finds that there

5  was a covered loss.

6          The next issue, whether Cincinnati has a duty

7  to indemnify the Town Square Mall for the covered loss,

8  depends on which policy is primary.  The relevant portions

9  of the Wausau insured agreement states, A, primary coverage.

10  This insurance is primary except where, B, below applies.

11  B, excess insurance.  This insurance is not excess over, sub

12  2, any other primary insurance available to you covering

13  liability for damages arising out of the premises or

14  operations for which you have been added as an additional

15  insured by attachment of an endorsement.  See Exhibit 7 to

16  the affidavits, relevant portions of Wausau Insurance

17  policy, form CG00010798, page 13.

18          The relevant portion of Cincinnati's insured

19  agreement states the insurance provided to the additional

20  insured does not apply to, quote, bodily injury, property

21  damage, personal injury or advertising injury arising out of

22  the, sub B, sole negligence or willful misconduct of or for

23  defects in design furnished by the additional insured or its

24  employees.  Any insurance provided hereunder shall be excess

25  over any other insurance available to the additional insured

1    as an additional insured by attachment of an endorsement to

2    another insurance policy, whether that other insurance

3    policy is primary, excess, contingent or on any other basis.

4    See Henn affidavit, Exhibit A, form GA4720199.  The plain

5    meaning of the just quoted section of the Cincinnati policy

6    is that it is excess coverage only with respect to someone

7    who has been added as an additional insured by endorsement

8    to another insurance policy.  Although Town Square Mall was

9    covered by the Wausau policy, it is not an additional

10   insured under that policy.  Therefore, the Cincinnati policy

11   is primary and Cincinnati has a duty to indemnify Town

12   Square Mall in the underlying litigation.

13            The final issue pertains to Cincinnati's

14   claim that the $99,000 settlement in the underlying personal

15   injury action is unreasonable.  Cincinnati argues it is

16   entitled to challenge the reasonableness of the amount paid

17   in settlement.  Wausau responds that because Cincinnati has

18   not put forth any evidence that the settlement is

19   unreasonable, there is no genuine issue of fact as to its

20   reasonableness.

21            Plaintiffs have provided evidence in support

22   of the settlement amount, including evidence concerning the

23   injuries in the underlying personal injury action, which was

24   a herniation of the cervical disk at C-6/C-7, resulting in

25   permanent partial disability, and evidence that liability in

1    that case was fairly certain.  In response, defendant has

2    not submitted any evidence tending to suggest that the

3    settlement was unreasonable or otherwise creating a triable

4    issue of fact -- I think that should be plaintiff.  In

5    response, plaintiff has not submitted any evidence tending

6    to suggest that the settlement was unreasonable --

7              MR. POTASHNER:  Your Honor, that might be --

8    I think it's defendant.

9              THE COURT:  You're right.  Excuse me.  I

10   think I have been doin' this too long.

11             On a motion for summary judgment, parties may

12   not rest on mere allegations but must provide the Court with

13   probative evidence tending to support their claim.  Anderson

14   versus Liberty Lobby, Inc., 447 U.S. 242.  Cincinnati has

15   the duty to provide the Court with evidence which it

16   believes demonstrates the unreasonableness of the settlement

17   agreed to by plaintiffs.  Without providing the Court with

18   evidence to support its claim and merely alleging

19   unreasonableness, Cincinnati has failed to carry its burden

20   and has put forth no genuine issue of material fact

21   concerning the issue of settlement.

22             For the foregoing reasons, plaintiffs' motion

23   for summary judgment is granted and defendant's cross-motion

24   for summary judgment is denied.  The Court finds that

25   defendant had and has a duty to defend Town Square Mall in

1    the personal injury action pending in state court, defendant

2    has a duty to indemnify Town Square Mall in the underlying

3    litigation, that the defendant's coverage is primary to that

4    of plaintiff Wausau, and plaintiffs are entitled to an award

5    of attorneys' fees, costs and settlement amount incurred in

6    Town Square Mall's settlement of the underlying personal

7    injury action.

8                        Plaintiffs are to submit an order on notice

9    to defendant within 11 days of today's date.

10                       Court stands adjourned in this matter.  Thank

11   you, gentlemen.

12                       MR. CASEY:  Thank you, Judge.

13                       MR. POTASHNER:  Thank you, your Honor.

14                       (This matter adjourned at 11:55 AM.)

15                             - - - - -

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION:

2

3

4                I, THERESA J. CASAL, RPR, CRR, Official Court

5   Reporter in and for the United States District Court, Northern

6   District of New York, do hereby certify that I attended at

7   the time and place set forth in the heading hereof; that I

8   did make a stenographic record of the proceedings held in

9   this matter and cause the same to be transcribed; that the

10  foregoing is a true and correct transcript of the same and

11  the whole thereof.

12

13

14

15                              _____

16                              THERESA J. CASAL, RPR, CRR

17                              Official Court Reporter

18

19

20

21  DATE:

22

23

24

25